Mr. Justice Wylie
delivered the opinion of the court.
This is an action for an alleged violation of a personal contract.
The defendant, at the time the action was brought, and when he was served with the summons requiring him to appear, was a member of the House of Representatives from the State of Texas, in attendance on its sessions in this District. To the declaration of the plaintiffs, the defendant filed a plea to the jurisdiction of the court, claiming that, by reason of his privilege as such member in attendance, he was *56 exempt from liability to service of the process in the action ; and to that plea, the plaintiffs filed a demurrer for insuf/vficiency in law. The issue so made is one to be deckled I according to the Constitution of the United States and the 1 parliamentary law.
The hardship of requiring the defendant to have the case tried in this jurisdiction, which was dwelt upon with so much earnestness by counsel, is a consideration which we are obliged to disregard, as one not involved in the issue which has been made up for our decision. It may be remarked, however, that in respect to the matter of inconvenience, the parties were originally on an equal footing. It would probably be quite as great an inconvenience that the plaintiffs should be obliged to resort to the courts of Texas to seek their remedy, as it is now for the defendant to make his defence in this District. In most cases, indeed, the inconvenience of the plaintiff would be greater than that of the defendant under such circumstances, for 'the reason that his is always the most difficult undertaking. A rule which would oblige every plaintiff to resort to the courts of the defendant’s jurisdiction, in order to seek redress for violation of contract, would give encouragement to bad faith, impair commercial credit, and be a mischievous policy.
"We now return to the consideration of the issue in the cause.
The Constitution of the United States declares as follows : “The Senators and ^Representatives shall, in all cases except treason, felony, and breach of the peace, be privileged from arrest during their attendance on the sessions of their respective houses, and in going to and returning from the same.” Art. 1, Sec. 6.
To any mind not fettered by authority, the meaning of this language could hardly be doubtful. The natural and plain interpretation would be that the privilege of exemption from arrest does not include exemption from citation or summons.
It is said, however, that the law is not to be interpreted according to the reason of the unlearned, but according to *57 the artificial reason of the judges and others learned in the law, by whose authority the decisions of courts ought to be controlled. And in general, this is a wise and necessary rule, for were it different, the administration of justice, by judicial tribunals, would become unsteady and capricious, and no one could be assured of his rights of either person or property.
The reasons given by its supporters for this claim of privilege on behalf of Senators and Members of the House of Representatives of exemption from the service of even a summons, during the period of attendance on the sessions of Congress, and eundo et redeundo, are said to be found in the interpretation which has been given to the parliamentary law of England, and thence engrafted upon the Constitution of the United States. In the courtly phrase of Blacks tone, the privileges of Parliament are “ very large and indefinite,” and “ the dignity and independence of the two houses are in a great measure preserved' by keeping their privileges indefinite;” and “the maxims upon which they proceed, together with the mode of proceeding, rest entirely in the breast of the Parliament itself, aud are not defined and ascertained by any particular stated laws.” Coke had previously laid down this doctrine in terms equally latitudinous. Anything which might “ molest ” the member during his term of exemption was construed to be a breach of privilege. He was not only privileged from arrest or summons at the suit of a citizen ; but any citizen who should do an act calculated to “ molest ” the member, so as to put him to the trouble of suing the citizen, was likewise held to be guilty of a breach of privilege. Abundant cases can be found in the journals where persons have been committed to prison for entering on the estates of members, carrying away timber, lopping trees, digging coal, fishing in their waters, &e. Their servants, and even their tenants, if the trespass were such as to affect the landlord’s property, had the same protection. Hallam’s Con. History, ch. 16. Such was the unparalleled immunity of members by the parliamentary law as interpreted by themselves and supported by the opinions of some *58 courtly judges of those times. Not all the courts or lawyers, however, wrere so forgetful of their loyalty to the principles of liberty and justice as to acknowledge the right of such pretensions. Lord Ch. J. Holt laid down a very different doctrine : “ The authority of Parliament,” said he, “ is from the law, and as it is circumscribed by law, so it may be exceeded, and if they do exceed those legal bounds and authority, their acts are wrongful and cannot be justified any more than the acts of private men.” Regina vs. Paty, 2 Salk., 504; 2 Ld. Raym., 1114; See Notes to 1 Cooley’s Bl., p. 164.
Even as early as the reign of Edward IV, in the case of Doune v. Welsh, the question being whether a privileged person was liable to be impleaded in the court of exchequer at the suit of a citizen, it w?as held that the privilege from arrest during the session of Parliament did not protect him from being impleaded, but only that he should not be arrested. And this decision wuis made by the barons of that court after consulting with the judges of both the other courts and was unanimous.
The decision was repeated by the same court in Ryver vs. Cosins, which came before it shortly afterwards. The judgment was as follows in both cases: “ratione alicujus transgressionis debiti, compuli, conventionis, contractus cujuscumquc, dum sic in Parliamenio regis morentur, capi aut arrestan, non debent; sed nullum hujusmodi consuetudinem, fore quod quin implacitari debent grout in breve illo supponitur.” See Dwarris on St., 145.
Again, the same question was made in the celebrated case of Benyon vs. Evelyn, in the Court of King’s Bench in the time of Charles II, and it was held that “ it is lawful to sue out an original against a member of the House of Commons although Parliament is sitting. The opinion of the court in this case was pronounced by Sir Orlando Bridgman, the Chief Justice, and Lord Campbell says “ was his most celebrated judgment, and endeared his memory to the enemies of parliamentary privilege!”
In this opinion it was, that the chief justice assailed, with *59 so much vigor, the authority of Lord Coke for the contrary doctrine contained in a brief commentary made by the latter in his treatise on the High Court of Parliament, (4 Inst., 24), on a report of an old case in the Near Books, decided in the reign of Edward I. Of this treatise the chief justice said it was “posthumous,” “abounding in miserable mistakes” and a “multitude of errors.” The whole of Coke’s commentary, on the subject referred to, is in these words : “And yet the serving of the citation did not arrest or restrain his. body, and the same privilege holdeth in case of subpoena.” Amongst the lawyers, this brief opinion of Coke had given weight to the doctrine that members of the House of Commons were not subject to suit or summons of any kind in a civil proceeding, during the sessions of Parliament. His authority, great as it is, and deserves to be, can hardly be regarded as sufficient to counterbalance the decisions made by the court of exchequer, after consultation with all the judges of the other courts and the decision in Benyon vs. Evelyn, made by the highest court of England.
Prynne, also, in his Animadversions on the 4th Institutes, and Lord Ellenborough, in Burdett vs. Abbott, 14 East., 1, express the opinion that the two cases from which Coke professed to derive his doctrine, had no reference whatever to the privileges of Parliament; and these opinions are reinforced by the opinion of Mr. Dwarris, in his work on Statutes, p. 141. Hatzell, also, says, “ This record does not appear to me to warrant the conclusion Sir Edward Coke draws from it, that the same privilege holdeth in case of subpoena or other process out of any court of chancery.” Prec., p. 6.
We have now seen that by the parlimentary law as expounded by the Parliament itself, by Sir Edward Coke, and Mr. Justice Blackstone, following these authorities, the privilege of a member of the House of Commons exempted such member, not only from arrest and summons during the session of Parliament, and eundo et redeundo, but also prohibited every body else from doing acts which might molest the member or put him to the trouble of instituting an action in court against such person, and that the privileges of mem *60 bers of Parliament were unlimited, except by the arbitrary will of the respective houses themselves. Such doctrine as that is intolerable in any government, except a despotism.
The courts, however, to their honor have, in this as in other instances, with, to be sure, occasional examples of deviation from the true doctrines, maintained and protected the living and essential principles of law and liberty, until at this day the law for which Holt contended, when he was in a minority of one to eleven amongst the judges, has became the established law of the English courts; and the rights of the citizens will be protected in opposition to an express order of either House of Parliament. Stockdale vs. Hansard, 7 C. & P., 737; 9 Ad. & El., I and II Ib., 253; May’s Con. History, C. 9.
In this case of Stockdale vs. Hansard, Lord Chief Justice Denman said: “The proceedings of Parliament would be liable to continual interruption, at the pleasure of individuals, if every one who claimed to be a crediter could restrain the liberty of the members. In early times their very horses and servants might require protection from seizure, under legal process, as necessary to secure their own attendance ; but when the privilege was strained to the intolerable length of preventing the service of legal process, or the progress of a cause once commenced against any member, or of threatening any who should commit the smallest trespass upon a member’s land, though in the assertion of a clear right, as breaches of the privilege of Parliament—these monstrous abuses might have called for the interference of the law, and compelled the courts of justice to take a part.”
At the date of the formation of our Constitution, however, every ground of controversy as respects this subject had been removed by an act of Parliament, which was passed seventeen years before (10th George III, ch. 50), which declared:
“ Sec. 1. Any person may at any time, commence and prosecute any action or suit in any conrt of record, or court of equity, or of admiralty, and in all causes matrimonial and testamentary, against any Peer or Lord of Parliament of *61 Great Britain, or against any of the knights, citizens or burgesses, &c.,for the time being, or against any of their menial or any other servants, or any other persons entitled ,to the privilege of Parliament: and no such action, suit or other process or proceeding thereupon, shall at any time be impeached, stayed or delayed by or under any color, or pretence of any privilege of Parliament.
“Sec. 2. But nothing in this act shall extend to subject the person of any of the knights, citizens and burgesses, members of the House of Commons for the time being, to be arrested or imprisoned upon any such suit or proceeding.”
This act settled all controversy, and declared that the peers as well as members af the House of Commons were amenable to suit as other persons at any tirue, except only that in civil proceedings their persons should be exempt from arrest. Our Constitution was signed in 1787, and was framed by men who could not have been ignorant of that act of Parliament. It is impossible to believe that they intended that the members of the Congress of the United States should have a greater extent of privilege in this matter, than belonged at that time to the Peers of Great Britain. It is well known that the current of public sentiment iu this country, was altogether in the opposite direction at that period of our history. From that day to the present, neither the Senate nor the House of Representatives has ever asserted such a claim in behalf of its members.
The contrary doctrine is laid down in Jefferson’s Manual, section 3d, and in Story on the Constitution, sections 859, 860 and 863. Mr. Jefferson says, “It was probably from this view of the encroaching character of privilege, that the framers of our Constitution, in their care that the law shall bind equally on all, and especially that those who make them shall not exempt themselves from their operation, have only privileged Senators and Representatives themselves from the single act of‘arrest in all cases except treason, felony and breach of the peace, during their attendance at the sessions of their respective houses, and in going to and returning from the same.’”
*62 Mr. Jefferson further says, “This privilege from, arrest, privileges of course against all process, the disobedience of which is punishable by attachment of the person, as a subpoena ad respondendum, or testificandum, or a summons on a jury ; and with reason because a member has superior duties to perform in another place.”
And yet in Burr’s trial, Chief Justice Marshall, after full argument of the question by able counsel and'time taken for consideration, directed a subpoena duces tecum to be issued to the President of the United States. (See proceedings of June 13, 1807.)
In Cooley on Constitutional Limitations, the same doctrine is laid down as follows: “By common parliamentary law, the members of the legislature are privileged from arrest on civil process during the session of that body, and for a reasonable time before and after to enable them to go and return from the same. By the constitutions of some of the States, this privilege has been enlarged, so as to exempt the persons of legislators from any service of civil process, and in others their estates are exempt, from attachment for some prescribed period.” S. P. in Gentry vs. Griffith, 27 Texas R., 461, and in Case vs. Rorabacker, 15 Mich., 537.
On the other hand, it is not to be denied, that, a contrary doctrine has been held by courts in one or two cases, and declared by the obiter dicta of several eminent judges in other eases.
The leading authority on that side of the question, and the source which has supplied the authority in this country for all the dicta of that kind which we find in the books, is the case of Bolton vs. Martin, 1 Dall., 296. The defendant in that case was a member of the convention which had been called by thé State of Pennsylvania, and was sitting in 1788 to consider the subject'of adopting or rejecting the Constitution of the United States, and was served- with a summons in a civil action. At that time the people of that-State were living under their constitution of 1776, which was silent on the subject of privilege. The Constitution of the United States had not yet been adopted, and if it had- *63 been adopted, would not have been law for such a case, arising under and to be determined according to the law of the State.
Judge Shippen set aside the service of the summons on the ground that, according to the general parliamentary law, the defendant was not subject to process of any kind whilst in attendance upon the convention, and as authority for such being the parliamentary law, cited the following passage from Blackstone’s Commentaries : “ Neither can any member of either house be arrested or taken into custody, or served with any process, without a breach of the privilege of parliament.”
As has been said before, this decision was made in the year 1788. At that time seven, perhaps eight, editions of Blackstone’s Commentaries had been issued. The two first editions were issued prior to the year 1770; the first was issued in 1765 from the Clarendon Press, Oxford. So, also, was the second. Both of these contain the passage as cited by Judge Shippen and quoted above ; but after the passage by Parliament of the act of 10th of George III, ch. 50, in the year 1770, Mr. Justice Blackstone with his own hand struck out that passage, and changed its reading to the present form, which is as follows : “Neither can any hi ember of either house be arrested and taken into custody, unless for some indictable offence, without a breach of the privilege of Parliament,” omitting the words, “ or served with any process,” on which Chief Justice Shippen relied for his decision in Bolton vs. Martin, eighteen years after the change had been made, and after numerous large editions of the work with the passage correct ed, had been given to the world. Nor was this the whole of the change made by the eminent commentator at that time, for immediately succeeding the sentence on which we have been remarking; he inserted an additional paragraph which is too long to quote, but which contains these two sentences: “But all other privileges which derogate from the common law in matters of civil right are now at an end, save only as to the freedom of the member’s person ;” and, “as to all other privileges which *64 obstruct the ordiuary course of justice, they were restrained by the statute, 12th William III, ch. 3; 2 and 3 of Ann., ch. 18, and 11th George II, ch. 24, and are now totally abolished by statute 10th George III, ch. 50, which enacts that any suit may at any time be brought against any peer or member of Parliament, their servants or any other person entitled to privilege of Parliament, which shall not be impeached or.delayed by pretence of any such privilege, except that a member of the House of Commons shall not, thereby, be subjected to any arrest or imprisonment.”
Of course it requires no argument to prove that no privilege of Parliament could exist contrary to an express act of Parliament. It is but a reasonable exercise of charity, however, to presume that Ch. J. Shippen, in making up his decision in that case, relied upon a copy from one of the early editions of the Commentaries which he had probably studied in his youth and believed to be as unchanged and unchangeable as the Koran.
This decision was followed two years afterwards by a dictum of the Supreme Court of Pennsylvania to the same general effect, in Geiger’s Lessee vs. Irvin, 4 Dall., 107. The question was not made in, nor did it belong to the case, but the court there says, “A member of the general assembly is, undoubtedly, privileged from arrest, summons, citation or other civil process, during his attendance on the public business confided to him.” As to the question at issue in that case, the decision was clearly erroneous, and in Nones vs. Edsall, 1 Well, jr., 189, Mr. Justice Grier said, “it was not law,” but by an obiter dictum of his own, adopted the obiter dictum of the Supreme Court of Pennsylvania, in the ease which he was then overruling.
All of us, perhaps, who have had much experience at the bar or on the bench, have felt, on many occasions, of how little worth are off-hand expressions of opinion in regard to subjects which are not involved in the issues to be decided, uttered without having heard them regularly argued, and without examination of authorities or deliberate consideration. In consequence, also, of the pressure of business or for *65 other urgent reasons, judges have not always the leisure to reduce their opinions to writing, but what they say is taken down by a reporter and often not submitted to him for revision afterwards. In this way his meaning is often not apprehended by the reporter, or the reporter may not discriminate wisely, and so observations which may fall from the judge in the warmth of discussion, not belonging to the case, and which were not designed to go into the opinion, find their way into printed books and so receive currency and are afterwards quoted as authority, where nothing better can be found. It often happens, also, that the opinion, as applied to the case in which it was given, is perfectly correct but is expressed in terms so general as to apply to other cases of a different character and as to these be altogether-unsound.
Another opinion which abounds with obiter dicta of the-most palpable description in regard to this question of privilege, is that of Lyell vs. Goodwin, 4 McLean, 29. The point decided, and the only point belonging to the case, was that a judge setting out on his circuit in performance of his official duties is not liable to be served with either a capias or a summons. The learned judge, (not Mr. Justice McLean,) likens his case to. that of a member of the British Parliament, refers to the decision of Chief Justice Shippen,in the case we have examined, quotes from the old edition of Blackstone, which had misled the chief justice, as though the book were before him, although it is safe to presume that he had never seen any copy of Blackstone which contained the passage which he professes to quote. The whole opinion is so abundant with exaggerated notions about parliamentary privilege, expressed in corresponding rhetoric, that we feel no inclination to consider it further. The decision was doubtless right, but the opinion is not authority for the question we have been discussing.
The case of Junean Bank vs. McSpedden, 5 Bissell, C. C. R., 64, involved a question whether a suitor, in attendance at court, was priviledged from service of a summons in a different action, and the service was set aside. In the *66 opinion, Mr. Justice Miller said: “In England the privilege’ from arrest has always been construed to include the service of a summons ; so in this country from a very early period.’*' The remark is certainly correct, as applied to that case, but is not authority, nor was it intended by that learned and’ able jurist to be authority, for any other case of a different character. The law’ which protects suitors and witnesses from service of legal process during their attendance on" courts and in coming and returning, is the creation of the courts themselves and grew out of the necessity of having the administration of justice conducted with efficiency, regularity and decency. At first, it was made to apply only to cases of arrest, but it was afterwards extended to cases of summons. The same authority which made the law, was competent to extend it. But should Congress enact a law for this district, declaring that suitors and witnesses shall in all cases, except treason, felony and breach of the peace, be ■ privileged from arrest during their attendance on the sessions of the courts and in going, to and returning from the -same, no one will say that this would include also a privilege from summons. It is a reasonable rule in the construction •of all statutes that when a privilege is conferred its operation will be restricted by the terms of the grant. The lawmaking power may confer an additional grant of privilege to the same parties, but in that case it could hardly be said with propriety that the second grant was included in the first. On the contrary, the privilege was extended, because it had not been previously enjoyed.
It is probable, as we think, that the inconvenience which may result to members of Congress in consequence of the construction which we feel ourselves constrained, by a sense of duty, to give to this part of the Constitution, will be found to occur but rarely, and to be rather in the idea than in practice. The Constitution has been construed not otherwise for nearly a hundred years, and no complaint on the subject has been made but in two or three instances, and no injury been inflibted in any.
On ‘the other’ hand, ’theré are reasonable grounds to believe *67 that serious injury might follow from a different construction of this part of the Constitution as well to the public-interests, as to those of private citizens.
We adhere, therefore, to the doctrine declared by us in the case of McKenna vs. Sprague, which was decided in 1868, and order that the demurrer to the plea be allowed, and that defendant have leave to answer over.
Note—A case occurred in this District in the year 1856, whicli illustrates to what a length privileged persons are sometimes disposed to Carry their pretensions. A case of homicide had occurred in the presence of the Dutch Minister, M. Dubois. The criminal was indicted and M. Dubois’ testimony was deemed necessary for the trial by the attorney for the Government. The minister, however, being privileged, an application was made to him through the Secretary of State, requesting him to appear at the trial in court, and give his testimony. But after a consultation with the other foreign ministers then in the city, and by their uuanimous advice, he declined to do so. Mr. Marcy, our Secretary of State, thereupon, instructed our minister at the Hague to bring the subject to the attention of that government. This having been done, the Dutch government declined to authorize M. Dubois to appear in court as a witness in the case, but consented that he might give his declaration under oath out of court, and ex parte. M. Dubois, in pursuance of this permission, then addressed a note to Mr. Marcy, saying that he was authorized by his government to make his statement of what he had seen and heard on the occasion, under oath, but at the Department of State, adding these words: “It is understood that on such occasion no mention is to be made of a cross-examination, to which I could not subject myself.”
Of course his declaration was not taken, as it could not have been-admitted as testimony at the trial. See Executive Doc. Senate, No. 21, 3d Sess., 34th Congress. A. Mc A.